Schultz Mr. Brindley, good morning. If you would just hold up for one second so we can get everybody settled. Okay. Go ahead. May it please the court, my name is Beau Brindley and I represent the defendant's appellant Robert and Lisa Hofschulz. In Ruan v. United States, the majority found that proving the guilt of a medical practitioner under the Controlled Substances Act, Section 841, requires proof that the practitioner issued a prescription that she knew was outside the scope of her authorization. That is the required mens rea after Ruan. The jury in this case was not given that instruction. That is an omitted element on a contested issue. How so? I looked at your proposed jury instructions here and your proposed jury instructions. Judge Rovner, I'm sorry, you were trying to ask the question. Go ahead. All right, thank you. You're welcome. The instruction the court ultimately gave applied the knowing or intentional standard to the outside the usual course of legitimate medical purpose requirement. The court did this by adding the word intentionally to the second element that the defendant did so by intentionally distributing or dispensing the controlled substance outside the usual course of professional medical practice, not for a legitimate medical purpose. Why isn't that sufficient under Ruan? The Supreme Court held that the same mens rea applicable to the elements should also be applicable to the acceptor's authorized provision. The use of intentionally in that instruction certainly seems to do just that, doesn't it? Two reasons that's not good enough, Judge. First of all, I don't think it does that because what intentionally says in that element is that the defendant intentionally distributed, and then it goes on to say outside the usual course of professional practice and without a legitimate medical purpose. So intentionally there, the jury can apply that to distribution and not to the professional practice and outside with no legitimate medical purpose. We asked for another element that said that the jury must find that the defendant knew that it was outside the usual course of professional practice and for no legitimate medical purpose. The district court refused that. And throughout the entirety of this discussion with the district court, the problem we had was that the district court insisted that this was a subjective standard and said that explicitly. I'm sorry, an objective standard. I misspoke. District court insists it's objective. Ruan says, no, it's not. It's absolutely subjective. But to follow up on, I think, what's more important, Your Honor. I think you're misstating the reasoning of the district judge in this case. The discussion of an objective standard relates to how the usual course of medical practice is proved and determined by the jury and the legitimacy of the medical purpose. Those are objective inquiries. Element number two of the charge here clearly incorporated the subjective standard of intent that the Supreme Court announced in Ruan. And the instruction did so in advance of Ruan. So Judge Pepper predicted accurately what the outcome in the Supreme Court's case would be. I really don't follow your argument about what she did wrong. And might I just add to that, please, that I thought that the court made clear that although the intent standard for acceptance authorized included a subjective component that allowed for the prescriber's belief that, you know, they were acting in an authorized manner, the government could prove that the defendant intended to distribute outside of that authorization by comparing the defendant's conduct to the objective standard and assessing whether the defendants did subjectively believe that their conduct was authorized by comparing the objective standard for professional conduct against the defendant's conduct and determining their intent by how much their conduct deviated from the objective standard. And I thought that's exactly what the instructions and the expert testimony allowed. So if you could, you know, answer both our queries, that'd be great. I think the critical problem here is the one that the Kahn II Court addressed when we presented this exact same argument in Kahn. And what they said is that applying the knowing standard to these prongs of Section 1306.04, the regulation, is not sufficient to establish guilt. In Kahn, they specifically said, in talking about Ruan and how Ruan cited Liperada, Kahn says knowingly acting with no legitimate medical purpose is not sufficient to establish guilt. Knowingly acting outside of professional norms is not sufficient to establish guilt. If Kahn II is right, these instructions don't work. They were wrong. Because the question is about what the defendant believed in terms of the scope of authorization. No, isn't it legitimate medical practice that you're leaving out here? Because clearly doctors can act outside the usual course of professional practice. They do that all the time. When you go to a doctor and say, I'm having migraines, and the doctor says, actually, there's this medication for Alzheimer's that works on migraines, and I'm going to prescribe you this medication, and you're going to take it, and it's going to fix your migraines. The government does not regulate the practice of medicine, right? So doctors do that all the time. They act outside the usual course of professional practice. But they act for a legitimate medical purpose. And that's the problem when you're prescribing opioids to drug dealers. You're not acting within the scope of legitimate medical purpose. And Judge, the problem here is the word legitimate. And I think that in Kahn II, the court explicitly said knowingly prescribing for no legitimate medical purpose is not sufficient to establish guilt. Because that is not the standard. Under Liparada and Ruan, which cites Liparada, the question is, did the defendant know that the prescription was legally unauthorized? That's why they're talking about Liparada. Liparada connects to authorization, as did the majority in Ruan. And so Kahn has to be wrong, if it's enough, to prove a knowing prescription with no legitimate medical purpose. And the point of it is, and the difficulty is, and what Kahn was getting at, is that legitimate medical purpose uses that objective term. And it is legitimate according to who? The Supreme Court majority could have applied the knowing mens rea to the language of the regulation. They did not. They were given that chance. It was argued that way. They said no. And they did so by criticizing the very language that we're talking about here in the court used here. The prongs of 1306.04, heavily criticized as vague and not able to readily separate guilty from innocent conduct. The mens rea doesn't apply to that language. It applies to authorization. The jury has to be told. Was Lisa Hochschultz not allowed to argue to the jury that she subjectively believed that the prescriptions were authorized? Or is your claim that the instructions did not allow for the jury to consider her subjective intent? Certainly she testified that she believed she was authorized. The problem is the jury instructions did not say that her belief about the scope of her authorization was dispositive. Ruan says it is. The district court here said a medical practitioner's own treatment methods do not constitute professional medical practice. According to Ruan, if a prescriber sincerely believes that he has the authorization to write a prescription, regardless of whether that purpose is different than what most other people in the medical community would deem legitimate, that's not a crime. And so according to Ruan, a medical practitioner's own treatment methods, if sincerely believed to be within his authorization, is professional medical practice for deciding whether you have a crime under Section 841. And the Ruan case specifically said that even failing to act in a manner that others in the medical community would view as medical care at all is insufficient. If that is insufficient, then so too is it insufficient to prove that someone knowingly acted for a purpose that his colleagues in the medical community might not find legitimate. The problem with the language that was criticized in Moore, that is criticized in Ruan, and that Ruan attempts to put a stop to, is that these words, usual course, and this word legitimate, legitimate according to who? Usual according to who? It's not clear enough. What is clear, as the court said, is what did the defendant think about the scope of authorization? Did she believe she was legally authorized to write the prescription, or did she not? And in Con 2, they said that's all that counts. Con said that this very same instruction, and I would argue that the Con instructions were more favorable, was not good enough and required reversal of all of Dr. Con's convictions when we presented the exact same argument to the Tenth Circuit, and the government presented the exact same argument to the Tenth Circuit that the government presents here. The Tenth Circuit agreed with us completely, and the Tenth Circuit is correct. I'd like to ask you a quick question about Mr. Hofschultz. Yes. Because he asserts on appeal that he had no medical training. Right. It appears he had no difficulty offering medical opinions to the staff. He told Nurse Kowsky, for instance, that handing out prewritten prescriptions was fine and kosher. Why wouldn't that right there be enough to show a conspiracy with Lisa? Well, he may have thought that that was okay, but he relied on Nurse Kowsky to do it, and Nurse Kowsky said that based on all of her experience, she thought it was okay, too. The problem with Mr. Hofschultz is that he lacked medical training, and more importantly, he didn't have specific information about the stability of these patients that the government contends is the reason why it was improper to give these prescriptions in the way that they were given. But ultimately, I think the important issue here is that the one that was addressed in CONTU, the government tries to say CONTU says what it does not, and the fact that the Supreme Court decided this case by likening it directly to Liberata. Liberata says you have to have knowledge that you're legally not authorized. The Supreme Court said that's what we're doing here, too. That's actually not what the Supreme Court said. Well, the Supreme Court cites that case and says just as there, here, the critical element is authorization. The last part of the court's opinion specifically authorizes the objective inquiry into the medical authorization question. Sure. They say you can prove it with circumstantial evidence, which is what CONTU says. These prongs can be objective evidence of whether or not someone is sincere in saying they believe they were authorized, but it is not sufficient to establish guilt. To say that the district court here was correct is to say that the Tenth Circuit is wrong, and we believe that would be an error that would create a circuit split that is unnecessary, given the citation of Liberata by the Supreme Court and given the position that was taken by the court in CONTU. And so with that, I would reserve the remainder of my time for rebuttal. Thank you. Mr. Tableson. May it please the court, Rebecca Tableson on behalf of the United States. Section 841 carries what the Supreme Court described as ordinary scienter requirements, knowledge or intent. Ruan held that in the prosecution of a medical provider, those ordinary scienter requirements apply to authorization to write a prescription. So the defendant must know she is prescribing in an unauthorized way or intend to do so. The question where I think we join issue here is what does unauthorized mean? The simplest and most obvious place to look is to what Ruan described as, quote, the regulatory language defining an authorized prescription. That's legitimate medical purpose in the usual course of professional practice. Now, the regulatory language from Section 1306.04 is not plucked from thin air. The opposite, as the Supreme Court has explained, it is a, quote, parroting regulation that, quote, does little more than restate the terms of the statute itself. That's Gonzalez against Oregon at 257, where the court traced the language of the regulation back to the CSA itself. So, for example, the phrase that Mr. Brinley complains about, legitimate medical purpose, that's right in 21 U.S.C. 829E2A and 21 U.S.C. 830B3A2. These are statutory terms, same with usual course of professional practice. So under Ruan and the CSA itself, a medical provider can be convicted if she knowingly or intentionally distributes drugs without a legitimate medical purpose or outside the usual course of professional practice. That, with a substantial defendant-friendly tweak, is precisely how the jury was instructed in this case, following the longstanding precedence of this court. And that is how the courts of appeal have been interpreting and applying Ruan. Ms. Tableton, in the instruction for controlled substances illegal distribution, that's page 30 of the instructions. The district court gave us the second element that the jury must find that the defendant did so by intentionally distributing outside the usual course, et cetera. The instruction does not require that she did so knowingly. Would that be problematic? That is the one defendant-friendly tweak that I was referencing. The correct thing to say is knowingly or intentionally, but intentionally is a higher CENTER standard than knowingly. So it would have been to our benefit to say knowingly or intentionally. We're obviously not raising that here. We're fine with it. But I think technically the very correct thing to do would be to say knowingly or intentionally. Okay. I want to address CON 2, which, contrary to my friend's assertion, does not endorse their willfulness standard. But there are two confusing sentences in CON 2 that I want to front with the court. The core problem that CON 2 identified is, under prior circuit precedent in the Tenth Circuit, the jury could convict if Dr. Kahn had either subjectively prescribed without a legitimate medical purpose or prescribed outside the objective course of professional practice. So that dichotomy with one purely objective element is obviously a no-go after Ruan. But that is not an issue in the Seventh Circuit or in this case. The second problem with the jury instructions in CON 2 was that they had a good-faith instruction that Ruan had criticized. Again, not a problem in this case. So the holding of CON 2 does not point to any error in the district court's instruction here. That being said, there are two confusing, in my view, sentences of reasoning on page 1316 of CON 2, saying that under Ruan, the criteria in Section 1306.04 are not distinct bases to support a conviction, but are references to objective criteria that may serve as circumstantial evidence of a defendant's subjective intent. I confess I am not sure what that means, nor how to apply it in practice. If the criteria in Section 1306.04 do not define what an authorized prescription is, then it's not clear what else would define it. CON 2 doesn't say. Again, CON 2 also seems unaware that Section 1306.4, that language, is just a parroting regulation that summarizes the statutory text. So that's the trick with CON 2. I'm not sure what to do with those sentences. But every other circuit to consider these issues post-Ruan has concluded that the question is, knowing or intent applied to legitimate medical purpose and in the course of professional practice. The Hofschultz's disagree. They think that unauthorized refers to the criminal prohibition in Section 841 itself, which has the effect of transforming this into a willfulness crime. That is a very far cry from the ordinary scienter requirements that the Supreme Court described in Ruan. Alternatively, or maybe in addition, I think the Hofschultz's argue in their brief that unauthorized might refer to the standards for criminal liability under the Harrison Narcotics Act of 1914, which is no longer in effect. The CSA expanded upon, and in any event, as the Supreme Court described in Moore, the Harrison Narcotics Act permitted conviction of, quote, physicians who departed from the usual course of medical practice. So that does not help. As a third alternative, and I think this really might be the heart of it, the Hofschultz's argue that the only real measure of authorization is the provider's own purely subjective view of what is appropriate. The provider's own personal prescription practices define the legitimate course of medicine. And you can see this in their jury instructions argument and also in their objection to Dr. King's testimony about what is objectively the legitimate practice of medicine. That is a radical idea that has no basis in the text of Section 841 or any case law. And the Supreme Court waved it off in Ruan. The Solicitor General had argued, oh, there's a risk we'll get to this purely subjective place. And the Supreme Court said, no, there's not. We're going to do this the normal way. You'll compare the conduct to the objective standards and see if you can prove the mens rea. I want to note also, as Judge Rovner mentioned, that notwithstanding these legal disputes, the Hofschultz's were able to and did make their mens rea arguments to the jury. Lisa Hofschultz testified at length that she was only trying to help her patients. That was perjury, as the district court found, and the jury rejected it. The Hofschultz's put their own expert on to talk about their own version of the practice of medicine. Again, their jury rejected that testimony. Mr. Brinley's entire closing argument was about mens rea, arguing without objection that his client's purpose was to treat pain and that the jury must acquit if they believe that. But the jury convicted on all counts after being correctly instructed. And that was the correct outcome legally and factually. Now, in theory, I do have a question. In theory, the defendants could have given 90-day prescriptions or allowed 90 days between visits for these prescriptions. Okay, I found this on the web. The defendants could have given 90-day prescriptions or allowed 90 days off between visits for these prescriptions. Check it out. I think Siri. I hear you, Judge Rovner. I'm sorry. I'm so sorry. Siri is my lawyer. What in particular makes the prescriptions issued in Lisa's absence but on Lisa's authority outside the usual practice? I mean, if she legitimately gave out the original prescriptions, could she have given two months more without further evaluation? Or is it because she never properly assessed or monitored these patients? Or is it because she didn't do so on these particular occasions when she was out of the office? It's a mix, Judge Rovner. So Dr. King testified about this at trial, as did multiple nurse practitioners who strenuously objected to this practice and told Mr. Hofschultz about it. What happened here is that Ms. Hofschultz left the clinic, and they, after multiple nurse practitioners refused to hand out prewritten prescriptions in her absence, Mr. Hofschultz hired a registered nurse, which I've now learned is a sort of lesser trained nurse who cannot hand out prescriptions, who handed out over 550 prescriptions in the absence of a medical practitioner examining these patients and determining these prescriptions were appropriate. And Dr. King explained that the files that—he examined some of the files of these patients who received these prewritten prescriptions and explained that those patients were not appropriate for the prewritten 90-day supply because they were not stable. And also, in addition, they had never been properly examined. There was no evidence in their files that medicine had ever been practiced. There was no diagnosis, no treatment plan, no follow-up on whether medicines were working. So I think it's a mix of a lot of the things you mentioned. I can briefly address the other two claims here just to give the court a chance to ask any questions. Dr. King's testimony, as all parties agreed below, this is squarely on all fours with Coley. Nothing about Rouen undermined Coley. Rule 704 and Coley confirm. There's no error here. And finally, as to sufficiency of the evidence, this was not a closed case. Ms. Hofschultz was the number one Medicaid prescriber in Wisconsin of oxycodone, methadone, and oxycontin in 2015. That's compared to cancer practitioners, palliative care doctors, doctors in major hospitals. She outdid them all from her clinic in Wauwatosa. Is my understanding that the clinic itself was basically a storefront kind of a clinic? There wasn't much in the way of medical apparatus? Yes, she practiced in two places, Judge. At the beginning, she practiced in sort of a single room in a chiropractic clinic that she rented by bartering opioid prescriptions from its owners. And that was just a one-room operation. Then they moved to the Mayfair Mall where they had sort of a suite. I'm looking at the trial attorney. Multiple rooms. One room with a table. Sorry, Judge. I just want to make sure I got you exactly the right answer. I've never seen it myself. But, yes, it was not a facility that was set up to properly examine and diagnose people. And, in fact, they did not do that. They charged $200 to $300 cash per visit. They didn't take Medicaid from the substantial number of patients who had it. They distributed over 2 million opioid pills into Wisconsin during the conspiracy period. Patients traveled from hours away to pay their cash and to get these drugs. Some patients got their prescriptions without ever having to set foot inside the clinic at all. Patient DT, for example, paid extra cash when she came to take home prescriptions for two others, RZ, her mentally disabled son, and another friend who the Hofschultzes were not permitted to physically enter the clinic because, quote, he had an odor. Lisa Hofschultz told DT to put these prescriptions in her bra as she left the clinic. At least one patient, Frank Ebel, died overdosing on pills supplied by the Hofschultzes. I could go on at some length, but I won't. I'm happy to answer any questions. If there are none further, we respectfully ask that you affirm the judgment below. Thank you. Mr. Brindley. I think some of the confusion here stems from the fact that whether a prescription is unauthorized is an objective question. Whether it's unauthorized is objective. But what Ruan says is the mens rea is a subjective question about what the defendant believes about the scope of authorization. This jury did not get any instruction that said or let them believe that the defendant's subjective belief about the scope of her authorization was sufficient. And the government says that it's a radical position to suggest that what Ruan means is, well, I think Kahn clearly says, what Kahn too is saying that they say they don't understand is these criteria from 1306, they're the objective evidence about whether a prescription is authorized or not. The mens rea question then is whether or not the defendant believed subjectively that she had the authority to do that. They criticize that as a wilfulness standard that's radical, but I point this out. It's in our brief. The standard the government suggests is close to the standard that the concurrence suggested. And what Justice Alito criticized was not applying a standard based just on good faith medical purpose, but taking a radical new course. That radical new course is the same standard that was announced in Liberata and applied here. And what that means is that a defendant, to be guilty, must know and believe that her conduct is outside the scope of her legal authorization. This jury received no instruction on that. That makes it an omitted element that requires reversal because it was a contested issue and pursuant to Netter, when you have an omitted element in a contested issue case, reversal is necessary here for the exact same reasons it was in Conn. Actually, that's not what Netter says, but we know what Netter says. Netter says you have evidence. The omitted elements are subject to harmless error review. They are in cases where the evidence is uncontested and overwhelming. That's what Netter says explicitly. But that's whether the standard is met, not whether the standard applies. Two separate questions. Sure, but under the Netter standard here, this was a contested issue. If we have an omitted element under Netter, as to mens rea, certainly, and it's a contested issue as it was, then overwhelming evidence doesn't matter. That position was also the same one discussed and announced in Conn too. Thank you. Thank you very much. Our thanks to all counsel. The case is taken under advisement, and we will take a brief 10-minute recess before calling the third case this evening. Thank you.